EXECUTION COPY

ASSET PURCHASE AGREEMENT


BY AND AMONG


ZGML ACQUISITION, INC.


William F. Schneider, Chapter 7 Trustee for the Bankruptcy Estate of ZyGEM Corporation,


AND


Andrew S. Goldstein, Chapter 7 Trustee for the Bankruptcy Estate of MicroLab Diagnostics, Inc.


Dated as of 27th day of April, 2015

## TABLE OF CONTENTS

**ASSET PURCHASE AGREEMENT** ........................................................................................... 1

**RECITALS** ................................................................................................................................ 1

   **1.**   **Transfer of Assets.** ....................................................................................................... 1

      a.   Purchase and Sale of Assets ................................................................................... 1

      b.   Excluded Assets. ..................................................................................................... 2

      c.   Instruments of Transfer. ......................................................................................... 2

   **2.**   **Purchase Price; Assumption of Certain Liabilities.** ................................................ 2

      a.   Payment of Purchase Price ..................................................................................... 2

      b.   Assumption of Liabilities. ....................................................................................... 2

   **3.**   **Preliminary Transactions.** ......................................................................................... 3

      a.   Preliminary Closing. ............................................................................................... 3

      b.   Sellers' deliveries at Preliminary Closing. .............................................................. 3

      c.   Buyer's deliveries at Preliminary Closing. ............................................................. 3

      d.   Exclusivity. ............................................................................................................. 4

      e.   Transfer Taxes. ....................................................................................................... 4

      f.   Exercise of Share Rights. ........................................................................................ 4

      g.   Landlord Rent. ........................................................................................................ 6

      h.   Preliminary Purchase Price Forfeiture. .................................................................. 6

      i.   Legend Consent ...................................................................................................... 6

      j.   Finality .................................................................................................................... 6

   **4.**   **Closing Transactions.** ................................................................................................ 6

      a.   Closing Conference ................................................................................................. 6

      b.   Closing Date ............................................................................................................ 7

      c.   Sellers' Deliveries at Closing .................................................................................. 7

      d.   Buyer's Deliveries at Closing. ................................................................................. 8

      e.   Taxes. ..................................................................................................................... 8

    f.    Possession. ........................................................................................................... 9

**5.**    **Conditions Precedent to Closing.**.................................................................... 9

    a.    Conditions to Sellers' Obligations. ................................................................. 9

    b.    Conditions to Buyer's Obligations................................................................ 10

    c.    Termination...................................................................................................... 11

    d.    Effect of Termination...................................................................................... 12

**6.**    **Seller's Representations and Warranties.** ................................................... 12

    a.    Authorization; Validity of Agreement; Action of Sellers............................. 12

    b.    Standing. ......................................................................................................... 13

    c.    Consents and Approvals; No Conflicts.......................................................... 13

    d.    Title to Purchased Assets. .............................................................................. 13

    e.    Absence of Certain Changes. ......................................................................... 14

    f.    Confidentiality. ............................................................................................... 14

    g.    Litigation and Claims..................................................................................... 14

    h.    Brokers or Finders.......................................................................................... 15

    i.    Affiliate Transactions..................................................................................... 15

    j.    New Zealand Shares. ...................................................................................... 15

    k.    Disclaimer of All Other Representations and Warranties.............................. 15

**7.**    **Buyer's Warranties and Representations.**.................................................... 15

    a.    Authorization; Validity of Agreement; Buyer Action. ................................. 15

    b.    Organization, Standing and Power. ............................................................... 16

    c.    Consents and Approvals; No Conflicts.......................................................... 16

    d.    Brokers........................................................................................................... 16

    e.    Disclosure of Information .............................................................................. 17

    f.    Acknowledgement of Disclaimer. ................................................................. 17

**8.**    **Conduct Prior to Closing.**............................................................................. 17

    a.    Access to Records and Purchased Assets. ..................................................... 17

    b.    Management of Purchased Assets Pending Closing...................................... 17

    c.    Bankruptcy Court Approval............................................................................ 18

**9.  Buyer's Agreement to Indemnify.**........................................................................... 19

**10.  Miscellaneous.**.................................................................................................... 19

**11.  Definitions.**......................................................................................................... 23

**SCHEDULE 1.a.:  Purchased Assets**.................................................................... XXIX

**ATTACHMENT A:  ZyGEM Patent Rights**............................................................ XXXI

**ATTACHMENT B:  MicroLab Patent Rights**.......................................................... XXXII

**SCHEDULE 1.b:  Excluded Assets** ..................................................................... XXXIII

**SCHEDULE 2.a.2:  Purchase Price Allocation** ............................................... XXXIV

**SCHEDULE 2.b:  Assumed Liabilities** ................................................................. XXXV

**SCHEDULE 5.k:  Affiliate Business Operations** ............................................ XXXVI

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is made and entered into as of April __, 2015 by and among William F. Schneider ("**ZyGEM Trustee**"), Chapter 7 Trustee for the bankruptcy estate of ZyGEM Corporation (the "**ZyGEM Debtor**"), Andrew S. Goldstein ("**MicroLab Trustee**," and together with the ZyGEM Trustee, the "**Trustees**" or "**Sellers**"), Chapter 7 Trustee for the bankruptcy estate of MicroLab Diagnostics, Inc. (the "**MicroLab Debtor**," and together with the ZyGEM Debtor, the "**Debtors**") and ZGML ACQUISITION, INC., a Delaware corporation ("**Buyer**").  Capitalized terms used in this Agreement are defined or otherwise referenced in Section 11.

## RECITALS

**WHEREAS**, an involuntary bankruptcy petition was filed against the ZyGEM Debtor for which an order for relief was entered under Chapter 7 of Title 11 of the United States Code in the United States Bankruptcy Court for the Western District of Virginia, Lynchburg Division (the "**Bankruptcy Court**").

**WHEREAS**, the MicroLab Debtor has commenced a case under Chapter 7 of Title 11 of the United States Code in the Bankruptcy Court.

**WHEREAS**, the Debtors are in the business of developing a rapid DNA analyzer for commercialization (the "**Business**").

**WHEREAS**, on the terms and conditions specified herein, Sellers wish to sell or cause to be sold to Buyer (or one or more of its Affiliates), and Buyer wishes to (or to cause one or more of its Affiliates to) purchase from Sellers, certain assets of the Debtors.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Transfer of Assets.**

   a. Purchase and Sale of Assets.

   Subject to the terms and conditions of this Agreement and the Sale Order, Sellers shall sell, convey, transfer, assign and deliver to Buyer or to one or more of its Affiliates as Buyer may designate, free and clear of all Liabilities and Liens, and Buyer or one or more of its designated Affiliates shall purchase and acquire from Sellers, all of Debtors' right, title and interest in all the assets set forth or referred to in Schedule 1.a. (the "**Purchased Assets**")

b.      Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall be limited to the items identified or described in Schedule 1.a. and shall in any event exclude all the assets set forth in Schedule 1.b (collectively, the "**Excluded Assets**").

c.      Instruments of Transfer.

The sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Buyer or its designated Affiliates shall be made by the instruments of assignment, transfer and conveyance provided for in Section 3. and 4.c below and such other instruments as may reasonably be requested by Buyer to transfer, convey, assign and deliver the Purchased Assets to Buyer or its designated Affiliates.

**2.     Purchase Price; Assumption of Certain Liabilities.**

a.      Payment of Purchase Price.

2.a.(1) Subject to the terms and conditions of this Agreement, in reliance on the agreements of the parties made hereunder and in consideration of the sale, conveyance, transfer and assignment of the Purchased Assets by Sellers, Buyer agrees that, Buyer will pay to Sellers an amount equal to $425,000.00 (the "**Purchase Price**"). The Purchase Price shall be paid as follows:

(i)      Within two (2) business days following execution of this Agreement, the Buyer shall deliver to Sellers a cash deposit of $100,000.00 by wire transfer (the "**Deposit**") to be held in escrow in an account and subject to terms and conditions mutually acceptable to Buyer and Sellers.

(ii)     On the Preliminary Transaction Date, the Deposit will be released to the Sellers by wire transfer or other mutually agreed method pursuant to the joint instructions of Buyer and Sellers (the "**Preliminary Purchase Price**").

(iii)    On the Closing Date, the Buyer will pay the Sellers the balance of the Purchase Price ($325,000.00) by wire transfer.

2.a.(2) The Purchase Price shall be allocated between the Debtors and among the Purchased Assets as set forth on Schedule 2.a.2.

b.      Assumption of Liabilities.

Except as set forth in Schedule 2.b, subject to the terms and conditions of this Agreement, at the Closing, Buyer shall assume no Liability or obligation of the Debtors.

2

3. **Preliminary Transactions.**

   a.   Preliminary Closing.

   The Preliminary Closing shall take place within two Business Days of the date of approval of the Sale Order by the Bankruptcy Court (the "**Preliminary Closing**").  The Preliminary Closing shall take place at the offices of LeClair Ryan, A Professional Corporation, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219, or if the parties mutually agree, by the delivery and exchange of all required closing deliverables by FedEx or another recognized overnight courier and/or by facsimile and/or by the electronic transmission of deliverables in PDF or a comparable format.

   b.   Sellers' deliveries at Preliminary Closing.

   On the Preliminary Closing Date, in consideration for the payment of the Preliminary Purchase Price, the Sellers shall deliver to the Buyer:

   (i)   A certified copy of the Sale Order, which shall not, prior to entry by the Bankruptcy Court, have been modified or amended in any manner that has not been agreed to in writing by Buyer in its sole discretion;

   (ii)   A copy of the December 11, 2013 Judgment Order entered by the Bankruptcy Court confirming that the ZyGEM Debtor is the sole shareholder of the New Zealand Subsidiary;

   (iii)   A Stock Transfer Agreement in form and substance reasonably acceptable to the Buyer and the ZyGEM Trustee and sufficient to transfer the Shares to the Buyer under New Zealand law;

   (iv)   An executed copy of the Call Option Agreement; and

   (v)   Instructions from the Sellers to release the Preliminary Purchase Price.

   c.   Buyer's deliveries at Preliminary Closing.

   On the Preliminary Closing Date, the Buyer shall deliver to the Sellers:

   (i)   A duly executed copy of the Stock Transfer Agreement;

   (ii)   An executed copy of the Call Option Agreement; and

   (iii)   The Buyer's instructions to release the Preliminary Purchase Price.

d.    Exclusivity.

The Sellers agree that neither they nor any of their Representatives shall solicit, discuss or accept any other offer relating to a Competing Transaction involving either of the Debtors during the period commencing on the date this Agreement is fully executed and ending on the earliest to occur of (i) the Hearing Date, if the Bankruptcy Court does not approve a Sale Order on such date, (ii) the date that is 60 days following the date of the Sale Order, (iii) the date that the Buyer gives written notice that it no longer wishes to pursue an acquisition of the Purchased Assets other than the Shares, and (iv) a termination of this Agreement pursuant to Section 5.c.3. or 5.c.4. (the "**Exclusivity Period**").  In addition, during the Exclusivity Period, neither the Sellers nor their legal counsel shall share any information relating to the Buyer's progress in completing the Target Actions or any documents secured by the Buyer with respect to the resolution of any of the Target Actions with any other Person.

e.    Transfer Taxes.

Any sales, purchases, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states or jurisdiction in which any portion of the Shares is located or deemed to be located, or any subdivision of any such state or jurisdiction, which may be payable by reason of the sale of the Shares under this Agreement (the "**Preliminary Transaction Taxes**") shall be borne and timely paid by Buyer, and Buyer shall not be entitled to any decrease in the Purchase Price for any amount required to be paid by Buyer under this section.

f.    Exercise of Share Rights.

During the period commencing on the Preliminary Closing Date and ending on the earlier of (x) the Closing Date and (y) the date of retransfer of the Shares pursuant to the Call Option Agreement, the Buyer will restrict the activities with respect to which it may exercise the rights attached to the Shares to do only the following:

(i)    Remove any current director from the Board of Directors of the New Zealand Subsidiary;

(ii)    Appoint a replacement director for the New Zealand Subsidiary, the identity of which should be notified in advance to the Trustees and should be reasonably acceptable as to reputation and character;

(iii)    Negotiate and compromise the claims of any creditor of the New Zealand Subsidiary, which shall be paid only from new value contributed by Buyer to the New Zealand Subsidiary;

(iv)    Cause the New Zealand Subsidiary to enter into an agreement with Waikato University to settle any claims of such person against the New

Zealand Subsidiary, which claims may be assumed by a newly formed New Zealand company organized by the Buyer;

(v)     Cause the New Zealand Subsidiary to challenge and attempt to have discharged or cancelled any lien or security interest in the assets of the New Zealand Subsidiary created in favor of the former shareholders or Neville Jordan or his affiliates;

(vi)    Cause the New Zealand Subsidiary to challenge and  have dismissed or compromise any claim against the New Zealand Subsidiary brought by Kinnon; and

(vii)   Establish the title of the New Zealand Subsidiary to any Intellectual Property claimed to be owned by the New Zealand Subsidiary.

The Buyer hereby covenants to use good faith commercially reasonable efforts to achieve completion of each of the foregoing actions (collectively, the "**Target Actions**"). Any costs and expenses incurred in achieving the foregoing Target Actions shall be funded by the Buyer and shall not be funded from existing assets of the New Zealand Subsidiary.

The Buyer hereby covenants that, during the period of ownership of the Shares and prior to the Closing Date, unless consented to by the Sellers, the Buyer shall not take any action or cause any action to be taken with respect to the Shares that does not constitute a Target Action.  Without limiting the generality of the foregoing sentence, the Buyer specifically shall not exercise any rights attached to the Shares in order to cause any of the following to occur:

(i)     The transfer of any assets or property of the New Zealand Subsidiary, other than for fair value to a newly formed New Zealand corporation wholly owned by the Buyer ("**NZ Newco**") and the shares of which are subject to the Call Option Agreement (the "**Newco Shares**"), the form and substance of which shall be subject to written approval of the Sellers (which shall not be unreasonably withheld);

(ii)    The transfer of the Shares or any rights relating to the Shares to any person;

(iii)   The issuance of any new equity interests or right to acquire any equity interest in the New Zealand Subsidiary;

(iv)    The granting of any lien or other encumbrance on any asset of the New Zealand Subsidiary;

5

      (v)     The incurrence of any debt on behalf of the New Zealand Subsidiary, other than debts and liabilities created in the ordinary course of business consistent with past practice;

      (vi)    The dissolution or liquidation of the New Zealand Subsidiary;

      (vii)   Any action that would be materially detrimental to the reputation of the New Zealand Subsidiary; and

      (viii)  The forfeiture or cancellation of any rights of the New Zealand Subsidiary. The foregoing actions described in clauses (i) through (viii) are referred to herein collectively as the "**Prohibited Actions**".

g.    <u>Landlord Rent</u>.

The Buyer shall pay the monthly rent payable under the Landlord Lease for the months of April and May 2015.

h.    <u>Preliminary Purchase Price Forfeiture</u>.

If the Sellers choose to exercise their rights under the Call Option Agreement, the Sellers shall be entitled to offset any damage to the value of the Shares resulting from any action taken by the Buyer that is not a permitted Target Action or that is a Prohibited Action against the Preliminary Purchase Price, provided, however, that any such setoff amount shall not exceed $50,000.

i.    <u>Legend Consent</u>

Legend Merchant Group, Inc. asserts a security interest in all assets of the ZyGEM Debtor, which the Trustee reserves all rights to challenge. Therefore, the Preliminary Closing is subject to the agreement of Legend Merchant Group, Inc., which the ZyGEM Trustee will endeavor to obtain prior to any hearing on the Sale Motion.

j.    <u>Finality</u>

Upon the Preliminary Closing, the Buyer shall not be entitled to reimbursement of the Preliminary Purchase Price for any reason, including termination of this Agreement, unless the Sellers exercise their rights under the Call Option Agreement subject to section 3.i.

**4.**    **Closing Transactions.**

a.    <u>Closing Conference.</u>

The Closing of the transactions provided for herein, other than the transactions closed as part of the Preliminary Closing, (the "**Closing**") shall take place at the offices of

LeClairRyan, A Professional Corporation, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219, or if the parties mutually agree, by the delivery and exchange of all required closing deliverables by FedEx or another recognized overnight courier and/or by facsimile and/or by the electronic transmission of deliverables in PDF or a comparable format.

b.      <u>Closing Date.</u>

The Closing shall be held as soon as practicable after entry of the Sale Order (the "**<u>Closing Date</u>**"), but no later than June 30, 2015 (the "**<u>Target Closing Date</u>**"), or such later date as the parties may agree. The Closing Date shall be held:

(i)      Within two Business Days of the date that the Buyer notifies the Sellers of the completion of all of the Target Actions; or

(ii)     Within two Business Days of the date of receipt by Sellers of a written notification from the Buyer (which notification may be given at any time either before or after the Target Closing Date) that the Buyer is willing to waive any Target Action that has not been achieved as of such date and to close on the Purchased Assets.

c.      <u>Sellers' Deliveries at Closing.</u>

On the Closing Date, Sellers shall make or cause to be made the following deliveries to Buyer:

4.c.(1) a copy of the Sale Order, which shall not, prior to entry by the Bankruptcy Court, have been modified or amended in any manner that has not been agreed to in writing by Buyer in its sole discretion;

4.c.(2) the Books and Records set forth on Schedule 1.a;

4.c.(3) a duly executed Bill of Sale;

4.c.(4) a duly executed copy of the Assignment of Intellectual Property;

4.c.(5) if the Shares have been re-transferred to the Sellers since the Preliminary Closing Date, a duly executed copy of the Stock Transfer Agreement; and

4.c.(6) any such other customary instruments of transfer, assumptions, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement or the transactions contemplated hereby at the Closing.

The documents referenced in Sections 4.c.(3) through 4.c.(6) are collectively referred to as the "**<u>Ancillary Agreements</u>**."

d.      Buyer's Deliveries at Closing.

On the Closing Date, Buyer shall make or cause to be made the following deliveries to Seller:

4.d.(1)   the Purchase Price, to be paid by Buyer by wire transfer in accordance with the instructions of the Sellers;

4.d.(2)   Buyer shall have delivered to Sellers reasonably appropriate evidence of all necessary corporate action by Buyer in connection with the transactions contemplated hereby, including, without limitation: (a) a certificate as to Buyer having obtained all necessary internal approvals of the transactions contemplated by this Agreement and authorizing the execution, delivery and performance by Buyer of this Agreement; and (b) a certificate as to the incumbency of officers of Buyer executing this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement; and

4.d.(3)   Executed counterparts of the Ancillary Agreements.

e.      Taxes.

4.e.(1)   Transfer Taxes.   Any sales, purchases, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Purchased Assets is located or deemed to be located, or any subdivision of any such state, which may be payable by reason of the sale of the Purchased Assets under this Agreement (the "**Transaction Taxes**") shall be borne and timely paid by Buyer, and Buyer shall not be entitled to any decrease in the Purchase Price for any amount required to be paid by Buyer under this section.

4.e.(2)   Tax Returns. Sellers shall prepare or cause to be prepared all Tax Returns required by law relating to the Purchased Assets for the periods ending on or prior to the Closing Date. Buyer shall prepare and file all Tax Returns relating to all real property Taxes, personal property Taxes, or similar ad valorem obligations levied with respect to the Purchased Assets for any taxable period beginning on or before and ending after the Closing Date (a "**Straddle Period**," and such Taxes, "**Straddle Period Taxes**"), whether imposed or assessed before or after the Closing Date, other than Straddle Period Tax Returns that the Sellers are required to file by applicable Law.  The liability for payment of each such Straddle Period Tax shall be prorated between Buyer and Sellers at the Closing Date based on 100% of the amount of such Straddle Period Tax imposed for the prior taxable period.  The portion of each such Straddle Period Tax that is allocable to Seller shall be the product of (i) 100% of the amount of such Tax for the prior taxable period and (ii) a fraction, the numerator of which is the number of days in the Tax period ending on the Closing Date and the denominator of which is the number of days in the entire Tax period.  Buyer shall be responsible for remitting all Straddle Period Taxes to the appropriate taxing authority when due.

4.e.(3)   Cooperation.   For shorter of 12 months or the closing of the Debtors' Bankruptcy Cases, Sellers and Buyer agree to furnish to each other upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Business (including access to Books and Records Related to the Business) as is reasonably necessary for the filing of all Tax Returns and other Tax filings, the making of any election related to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return. Sellers and Buyer shall use reasonable efforts to cooperate with each other in the conduct of any audit or other proceeding related to Taxes and each shall execute and deliver such other documents as are reasonably necessary to carry out the intent of this Section 3.e.3. Sellers and Buyer shall provide timely notice to each other in writing of any pending or threatened Tax audits, assessments or litigation with respect to the Purchased Assets or the Business for any taxable period for which the other party may have liability under this Agreement.

f.      Possession.

The right to possession of the physical, tangible Purchased Assets shall transfer to Buyer on the Closing Date.   Sellers shall transfer and deliver to Buyer on the Closing Date such items as Buyer may reasonably require to obtain control and possession of the Purchased Assets.  The Sellers shall cooperate with the Buyer to allow the Buyer to take possession of the Purchased Assets, but shall have no duty to deliver possession.

5.    **Conditions Precedent to Closing.**

a.      Conditions to Sellers' Obligations.

Sellers' obligations to make the deliveries required of Sellers at the Closing Date and to consummate the Closing shall be subject to the satisfaction or waiver by Sellers of each of the following conditions.

5.a.(1)   Buyer shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date.

5.a.(2)   All the representations and warranties of Buyer shall be true and correct in all material respects as of the date hereof and as of the Closing Date.

5.a.(3)   Buyer shall have made the deliveries described in Section 4.d.

5.a.(4) Buyer shall have obtained releases from Northwestern University releasing any and all claims of Northwestern University against the Debtors or shall have assumed such liabilities (which assumption shall have been consented to in writing by Northwestern University).

5.a.(5)   No action, suit or other proceedings shall be pending before any court, tribunal or Government Entity seeking or threatening to restrain or prohibit the

consummation of the transactions contemplated by this Agreement, or seeking to obtain material damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any Law, decree or regulation of any Government Entity having appropriate jurisdiction.

5.a.(6) Court shall have entered the Sale Order in a form acceptable to Sellers in accordance with <u>Section 8.c</u> and the Sale Order shall not have been stayed as of the Closing Date.

5.a.(7)  The Buyer shall have provided general releases of the Trustees, the Debtors and the estates from any Liabilities or obligations to, or in respect of, the Debtors, the Purchased Assets and the Business, other than the obligations of any such parties under this Agreement.

b.      <u>Conditions to Buyer's Obligations.</u>

Buyer's obligation to make the deliveries required of Buyer at the Closing Date and to consummate the Closing shall be subject to the satisfaction or waiver by Buyer of each of the following conditions:

5.b.(1) Sellers shall have performed in all material respects all obligations required to be performed by them under this Agreement at or prior to the Closing Date.

5.b.(2) All the representations and warranties of the Sellers shall be true and correct in all material respects as of the date hereof and as of the Closing Date.

5.b.(3) Sellers shall have made the deliveries described in <u>Section 4.c</u>.

5.b.(4) No action, suit or other proceedings shall be pending before any court, tribunal or Government Entity seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain material damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any Law, decree or regulation of any Government Entity having appropriate jurisdiction.

5.b.(5) The Bankruptcy Court shall have entered the Sale Order in form and substance acceptable to Buyer, in accordance with <u>Section 8.c</u>, and the Sale Order shall not have been stayed as of the Closing Date.

5.b.(6) The Bankruptcy Court shall have approved the general release agreements from R. Paul Gray and Robert J. Flynn, Jr. releasing all claims of such parties against either of the Debtors or the New Zealand Subsidiary and its directors currently pending before the Bankruptcy Court.

5.b.(7) The Buyer shall have received an acceptable term sheet from Lockheed Martin Corporation with respect to the use by the Buyer of assets owned by Lockheed Martin Corporation and used in connection with the Business.

5.b.(8) The Buyer or an Affiliate shall have entered into an agreement to lease the premises currently occupied by the Debtors on mutually acceptable terms.

5.b.(9)  The Target Actions shall have been completed and the Zealand Subsidiary or NZ Newco shall have entered into agreements in form and substance acceptable to the Buyer relating to the Target Actions.

c.      <u>Termination.</u>

Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time on or prior to the Closing Date as follows:

5.c.(1)  by the mutual written consent of both Sellers and Buyer;

5.c.(2)  by Buyer or either Seller if the Closing shall not have occurred by June 30, 2015, or such later date as may be agreed to by the parties (the "**Closing Deadline**"); *provided*, *however*, that the right to terminate this Agreement pursuant to this Section 5.c.2 shall not be available to any party hereto whose failure to perform any of its obligations under this Agreement results in the failure of the Closing to be consummated by such date;

5.c.(3)  by Buyer, if (a) the Sellers shall have breached or failed to perform in any material respect any of their representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Sections 5.b.1 and 5.b.2, and (ii) is incapable of being cured by Sellers or is not cured by Sellers at least one (1) day before the Closing Deadline, following receipt of written notice from Buyer of such breach or failure to perform, or (b) following the expiration of the Exclusivity Period, the Bankruptcy Court enters an order authorizing a Competing Transaction; or

5.c.(4)  by either Seller, if (a) Buyer shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Sections 5.a.1 and 5.a.2, and (ii) is incapable of being cured by Buyer or is not cured by Buyer at least one (1) day before the Closing Deadline following receipt of written notice from either Seller of such breach or failure to perform, or (b) following the expiration of the Exclusivity Period, the Bankruptcy Court enters an order authorizing a Competing Transaction.

d.      Effect of Termination.

5.d.(1)   If this Agreement is terminated prior to Closing in accordance with Section 5.c., this Agreement shall become null and void and of no further force and effect, without any Liability or obligation on the part of any party, other than the provisions of: Section 3 (Preliminary Transactions) and Subsection 5.d. (Effect of Termination); 8.c (Bankruptcy Court Approval); 10.b. (Notices), 10.c. (Entire Agreement), 10.d (Modification), 10.i (Payment of Fees and Expenses), 10.j (Assignments), 10.l (Applicable Law), and 10.t (Bankruptcy Court of Jurisdiction), which provisions shall survive such termination.

5.d.(2)   In connection with any termination of this Agreement:

(i)      each party shall use its commercially reasonable efforts to cause all filings, applications and other submissions made by such party to any Government Entity or Person pursuant to this Agreement, to the extent practicable, to be withdrawn from such Government Entity or Person to which made;

(ii)     in the event that the Sellers exercise their rights under the Call Option Agreement, the Buyer shall transfer the Shares to the Sellers in accordance with the Call Option Agreement; and

(iii)    in the event that the Sellers exercise their rights under the Call Option Agreement, the Sellers shall pay to the Buyer the Preliminary Purchase Price less any amount forfeited to Sellers.

5.d.(3) Contemporaneously with the closing of a Competing Transaction approved by order of the Bankruptcy Court, the Sellers shall pay to the Buyer an amount equal to the aggregate amount of (i) rent and other amounts paid by the Buyer to the Landlord in immediately available funds in accordance with the wire transfer instructions of the Buyer and (ii) up to $50,000.00 in out of pocket expenses incurred by the Buyer in resolving issues related to the New Zealand Subsidiary.

**6.      Seller's Representations and Warranties.**

The Sellers hereby make the following representations and warranties to Buyer:

a.      Authorization; Validity of Agreement; Action of Sellers.

Subject to entry and effectiveness of the Sale Order, each of the Sellers has the power and authority (a) to execute and deliver this Agreement and each Ancillary Agreement to which such Seller is or will be a party to at the Preliminary Closing or Closing, as applicable (b) to perform their obligations hereunder and thereunder, and (c) to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly and validly executed and delivered by each of the Sellers and (assuming this

Agreement constitutes a valid and binding obligation of Buyer) constitutes the legal, valid and binding obligation of each of the Sellers, enforceable against each of the Sellers in accordance with its terms, except (i) as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability (the **"Enforceability Exceptions"**), and (ii) that enforceability of the provisions hereof requiring consummation of the transactions contemplated hereby is subject to entry and effectiveness of the Sale Order or any other action by the Bankruptcy Court (the "**Bankruptcy Exceptions**").  Subject to entry and effectiveness of the Sale Order, each Ancillary Agreement to which each of the Sellers is or will be parties will be duly and validly executed and delivered by the applicable Seller at or prior to the Preliminary Closing or Closing, as applicable, and upon such execution and delivery (assuming such Ancillary Agreement constitutes a valid and binding obligation of each other party thereto) will constitute the legal, valid and binding obligation of the Sellers, enforceable against the Sellers in accordance with its respective terms, subject to the Enforceability Exceptions and the Bankruptcy Exceptions.

b.      Standing.

        The Trustees are the duly appointed Chapter 7 Trustees of the Debtors and have all requisite authority and, subject to any required Bankruptcy Court approval, authority to own and hold the Purchased Assets.

c.      Consents and Approvals; No Conflicts.

        Subject to the approval of the Bankruptcy Court, none of the execution, delivery or performance of this Agreement and Ancillary Agreements by Sellers, the consummation by Sellers of the transactions contemplated hereby or thereby or compliance by the Sellers with any of the provisions hereof or thereof will, unless otherwise noted in this Agreement or any Ancillary Agreement, (a) require the Sellers to make any filing with, or obtain any permit, authorization, consent or approval of, any Governmental Entity or other Person (including consents from parties to any Contracts or any loans, contracts, leases and other agreements to which any of the Sellers or the Debtors is a party), (b) require any consent, approval or notice under, or result in a violation or breach of, or constitute (with or without due notice or the passage of time or both) a default (or give rise to any right of termination, amendment, cancellation or acceleration) under, any Contract to which the Debtors are parties or to which their assets or properties are subject or restriction of any kind by which the Debtors are bound, or (c) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Debtors or any of their properties or assets (except to the extent any of the foregoing is rendered inapplicable by order of the Bankruptcy Court).

d.      Title to Purchased Assets.

        To the Knowledge of the Sellers, the Debtors have good and marketable title to each of the Purchased Assets, or the rights to use (as currently used), such portions of

Purchased Assets as are identified on Schedule 1.a. as being used under a Contract authorizing such use.

e.       Absence of Certain Changes.

As of the date hereof, except as a result of the commencement of each Debtor's applicable bankruptcy case, the Sellers have not:

6.e.(1) paid or loaned any amount to, or sold, transferred or leased any properties or assets (real, personal or mixed, tangible or intangible) to, or entered into any agreement or arrangement with, any other Person, including, without limitation, any of the Debtors' officers or directors or any Affiliate or "associate" (within the meaning set forth in Rule 12b-2 promulgated under the Securities Exchange Act of 1934, as amended) of any of the Debtors' officers, except for compensation of officers in the ordinary course of business;

6.e.(2) incurred any Liability relating to or affecting the Purchased Assets that would reasonably be foreseen to create a Liability of Buyer;

6.e.(3) mortgaged, pledged or subjected to any other Liability or Lien any of the Purchased Assets except in the ordinary course of business and consistent with past practice; or

6.e.(4) except as provided in this Agreement, agreed, whether in writing or otherwise, to take any action described in this Section 5.e.

f.       Confidentiality.

To the Knowledge of the Sellers, the Sellers have taken all steps reasonably necessary to preserve the confidential nature of all material confidential information (including any trade secrets and other proprietary information) Related to the Business.

g.       Litigation and Claims.

As of the date hereof, there is no action, suit, demand, inquiry, proceeding, claim, hearing or investigation by or before any Government Entity pending or, to the Knowledge of the Sellers, threatened against or involving any of the Purchased Assets. Neither the Seller nor the Purchased Assets are subject to any judgment, writ, award, injunction, order of any Governmental Entity or decree that is Related to the Business.

h.      Brokers or Finders.

No agent, broker, investment banker, financial advisor or other firm or Person is or will be entitled to any brokers' or finder's fee or any other commission or similar fee in connection with the transactions contemplated hereby as a result of any action taken by Sellers.

i.      Affiliate Transactions.

To the Knowledge of the Sellers, there are no contracts, agreements, commitments or other continuing transactions Related to the Business between (a) the Debtors, on the one hand, and (b) any Affiliate of the Debtors or any present or former director, officer or management employee of the Debtors or any Affiliate of the Debtors.

j.      New Zealand Shares.

The Sellers have not created any options, warrants or other rights of any kind that would entitle the holder to acquire from the New Zealand Subsidiary any equity interests of the New Zealand Subsidiary or securities convertible into or exchangeable for, or which otherwise confer on the holder thereof any right to acquire, any such additional equity interests, nor is the New Zealand Subsidiary committed to issue any such option, warrant, right or security created by Sellers.

k.      Disclaimer of All Other Representations and Warranties.

Except as otherwise specifically stated herein, the Sellers, on behalf of themselves, the Debtors, the Debtors' estates and their agents, counsel and representatives hereby disclaim any warranty, guaranty or representation, express or implied, oral or written, past, present, or future, of, as to, or concerning (a) the condition or state of repair of the Purchased Assets, including, but not by way of limitation, the status of any Purchased Asset that constitutes intellectual property with the United States Patent Office or the patent authority of any other country or sovereignty; (b) the compliance of any of the Purchased Assets or the operation of the Business with any applicable laws, ordinances, or regulations of any government or other body; and (c) the physical condition of the Purchased Assets.  The sale of the Purchased Assets is on an "AS IS, WHERE IS, WITH ALL FAULTS," basis.

**7.      Buyer's Warranties and Representations.**

Buyer hereby makes the following representations and warranties to Sellers:

a.      Authorization; Validity of Agreement; Buyer Action.

Buyer has the corporate power and authority (a) to execute and deliver this Agreement and each Ancillary Agreement to which Buyer is or will be a party to at Preliminary Closing or Closing, as applicable, (b) to perform its obligations hereunder and thereunder, and (c) to consummate the transactions contemplated hereby and thereby.

15

The execution, delivery and performance of this Agreement by Buyer and of each Ancillary Agreement to which Buyer is or will be a party at the Preliminary Closing or Closing, as applicable, and the consummation by Buyer of the transactions contemplated hereby and thereby, have been duly authorized by all necessary corporate action on the part of Buyer and no other corporate actions or proceedings on the part of Buyer are necessary to authorize this Agreement, any Ancillary Agreement or any of the transactions contemplated hereby and thereby.   This Agreement has been duly and validly executed and delivered by or on behalf of Buyer and (assuming this Agreement constitutes a valid and binding obligation of the Sellers) constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability.

b.      Organization, Standing and Power.

On execution of this agreement the Buyer (a) is a legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation, and (b) has all requisite corporate or other organizational power and authority to own, lease, hold and operate its properties and assets and to carry on its business as presently conducted.  Buyer is qualified to do business as a corporation or foreign corporation, as applicable, and is in good standing in all jurisdictions where it owns or leases real property in connection with its business or otherwise conducts its business, except where the failure to so qualify or to so be in good standing has not had and would not reasonably be expected to have a Material Adverse Effect.

c.      Consents and Approvals; No Conflicts.

The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer do not and will not: (a) conflict with or result in a breach of the articles of incorporation or by-laws of Buyer; (b) violate any statute, Law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; (c) violate or conflict with or constitute a default under any material agreement, instrument or writing of any nature to which Buyer is a party or by which Buyer or its assets or properties may be bound; or (d) require any Consent from, or notice to, any third party.

d.      Brokers.

No agent, broker, investment banker, financial advisor or other firm or Person is or will be entitled to any brokers' or finder's fee or any other commission or similar fee in connection with the transactions contemplated hereby as a result of any action taken by Buyer.

e.      Disclosure of Information

As of the execution date of this Agreement, the Buyer affirms that it has not obtained through its due diligence any information that would suggest that any representation or warranty made by the Sellers in this Agreement or in any Ancillary Agreements attached hereto is inaccurate.

f.      Acknowledgement of Disclaimer.

The Buyer hereby acknowledges and agrees that (i) the Sellers, the Debtors, the Debtors' estates, and their employees, agents, counsel and representatives, make no warranty or representation, express or implied, or arising by operation of law (other than as set forth herein) including, but not limited to, any warranty of condition, habitability, merchantability or fitness for a particular purpose, with respect to the Purchased Assets; (ii) the Buyer is purchasing the Purchased Assets based on its own investigation and acknowledges that it has conducted such investigation as it has deemed necessary or advisable and that it is not relying upon any representations of Trustees, the Debtors, or their employees, agents, counsel, and representatives whatsoever other than those set forth herein; and (iii) the Buyer's decision to purchase the Purchased Assets is based solely on its own investigation, due diligence, estimates and studies.

**8.    Conduct Prior to Closing.**

a.      Access to Records and Purchased Assets.

From and after the date of this Agreement until the Closing Date, subject to any confidentiality agreement entered into between Buyer and Sellers, and subject to any limitations ordered by the Bankruptcy Court or otherwise in connection with the Debtors' Bankruptcy Cases, Sellers shall afford to Buyer's officers, independent public accountants, counsel, lenders, consultants and other representatives, reasonable access for examination at all reasonable times to the Purchased Assets and all records pertaining to the Purchased Assets. Buyer expressly acknowledges that nothing in this Section 8.a is intended to give rise to any contingency to Buyer's obligations to proceed with the transactions contemplated herein.

b.      Management of Purchased Assets Pending Closing.

Subject to any obligations of the Trustees under the Bankruptcy Code, or any order of the Bankruptcy Court, the Sellers covenant and agree that, after the date hereof and prior to the Closing Date, except as expressly provided in this Agreement or as may be agreed in writing by Buyer:

8.b.(1) Absent an agreement to allow the Buyer to manage the Purchased Assets prior to Closing, Sellers shall maintain the Purchased Assets as currently maintained and Sellers shall use commercially reasonable efforts to preserve (subject to normal wear and tear and use or other disposition in the ordinary course of business) the Purchased Assets.

8.b.(2) Notwithstanding any other requirement herein, the Sellers have no obligation to maintain in any way any of the Purchased Assets that constitute intellectual property with the United States Patent Office or any other patent authority within or outside of the United States.  Additionally, the Sellers have no obligation hereunder to enforce or take any affirmative action to protect any patent or other intellectual property rights.

8.b.(3) Neither the Sellers nor any of their Affiliates shall lease, license, mortgage, pledge or encumber any Purchased Assets or purchase, transfer, sell or dispose of any Purchased Assets;

8.b.(4) The Buyer shall pay to the Landlord the rent due in accordance with the Landlord Lease with respect to April and May 2015; and

8.b.(5) All of the MicroLab Debtor's employees were terminated as employees of the MicroLab Debtor as of May 5, 2014.  The Buyer, or any of its Affiliates, may in their discretion employ or otherwise seek the assistance of any or all of the terminated employees of the MicroLab Debtor in their sole discretion as of May 5, 2014.

c.      Bankruptcy Court Approval.

Sellers shall make a motion (the "**Sale Motion**") for an order (the "**Sale Order**") from the Bankruptcy Court within five business days following the date of this Agreement which (a) approves the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement and authorizes Sellers to proceed with this transaction, (b) includes a specific finding that Buyer is a good faith purchaser of the Purchased Assets, and (c) states that the sale of the Purchased Assets to Buyer shall be free and clear of all Liens, claims, interests and Liabilities whatsoever.  Sellers shall use reasonable efforts to (i) obtain the Sale Order and (ii) to persuade the Bankruptcy Court to conduct a hearing relating to the Sale Order upon seven days' notice to creditors of the Debtors, provided, however, the parties acknowledge that if the Bankruptcy Court does not agree, the hearing shall be subject to 21 days' notice to creditors (the date of such hearing is referred to herein as the "**Hearing Date**").   Both Buyer's and Sellers' obligations to consummate the transactions and perform any other obligations contemplated in this Agreement shall be conditioned upon the Bankruptcy Court's entry of the Sale Order in form satisfactory to all parties.  Subject to Sections 5.c and 5.d, if (i) the Bankruptcy Court refuses to issue the Sale Order, (ii) a third party purchaser for the Purchased Assets or any material portion thereof is approved by the Bankruptcy Court at the hearing on the Sale Motion, then in any such event, this transaction shall automatically terminate, the Sellers shall repay to Buyer the entire amount of the Deposit (which shall be released on the joint instructions of Buyer and Sellers), and Sellers and Buyer shall be relieved of any further Liabilities hereunder.

18

**9.**      **Buyer's Agreement to Indemnify.**

   a.       Generally.

From and after the Closing, Buyer shall indemnify and hold harmless Sellers, the Debtors and their Affiliates, officers, directors, stockholders, employees, agents and representatives (the "**Seller Indemnified Parties**") from and in respect of any and all Losses that they may incur arising out of or due to (a) any breach of or any inaccuracy in any representation or warranty made by Buyer contained in this Agreement or any Ancillary Agreement; (b) any breach by Buyer of or failure by Buyer to perform any covenant or agreement of Buyer contained in this Agreement or any Ancillary Agreement; (c) any Liabilities of Buyer, including, but not limited to, any investment banker's, broker's or finder's fees or other fees and expenses, and legal fees and expenses incurred by Buyer in connection with the transactions contemplated by this Agreement; (d) the ownership or operation of the Purchased Assets or the Business after the Closing Date; and (e) the Assumed Liabilities.

**10.**     **Miscellaneous.**

   a.       Loss or Destruction.

Sellers shall notify Buyer immediately upon the Knowledge of the Sellers of the occurrence of any material loss or destruction of the Purchased Assets which occurs prior to the Closing Date.  In the event of any material loss or destruction of all or a portion of the Purchased Assets which is not fully covered by insurance, Buyer, at its option, may either (i) terminate this Agreement, in which case Sellers and Buyer shall be relieved of any further Liabilities hereunder, or (ii) consummate the purchase provided for by this Agreement.  In all other events or in the event that Buyer elects to consummate the purchase pursuant to (ii) above, all insurance proceeds relating to the Purchased Assets collected by the Seller prior to the Closing Date, together with an amount equal to all deductible amounts under the insurance policies covering such loss or destruction and amounts not covered by insurance (which amounts shall be agreed upon in good faith by Sellers and Buyer and approved by the Bankruptcy Court), shall be credited against the Purchase Price on Buyer's account, and all entitlement to all other insurance proceeds arising out of such loss or destruction and not collected prior to the Closing Date shall be retained by Sellers.

   b.       Notices.

Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by either party to the other shall be in writing and may be effected by (a) personal delivery, (b) by nationally recognized overnight courier (marked for overnight delivery), or (c) by registered or certified mail, postage prepaid, return receipt requested, and shall be deemed communicated (i) upon delivery in the case of personal delivery, (ii) if sent by a nationally recognized overnight courier service, one business day after the same has been delivered to such courier service marked for overnight delivery, or (iii) if

mailed, five business days after the same has been deposited in the mails by registered or certified mail, postage prepaid, return receipt requested.   Mailed notices shall be addressed as set forth below, but each party may change his address by written notice in accordance with this paragraph.

| To Sellers: | William F. Schneider, Chapter 7 Trustee for the Bankruptcy Estate of ZyGEM Corporation |
| | 715 Court Street |
| | P.O. Box 739 |
| | Lynchburg, Virginia 24505 |
| | |
| | -and- |
| | |
| | Andrew S. Goldstein, Chapter 7 Trustee for the Bankruptcy Estate of MicroLab Diagnostics, Inc. |
| | 310 First Street, SW |
| | Roanoke, Virginia 24011 |
| | |
| With a copy to: | LeClairRyan, A Professional Corporation |
| | Attn: Vernon E. Inge, Jr. |
| | Riverfront Plaza, East Tower |
| | 951 East Byrd Street |
| | Richmond, Virginia 23219 |
| | Attn: Vernon E. Inge, Jr., Esq. |
| | |
| To Buyer: | ZGML Acquisition, Inc. |
| | Attn: Mr. Richard Healey |
| | 200 South 10th Street |
| | Suite 1600 |
| | Richmond VA 23219 |
| | |
| With a copy to: | Thomas Eggar |
| | Attn: John Riddick |
| | Brunel House, |
| | 21 Brunswick Place, |
| | Southampton Hampshire SO15 2AQ |

c.       Entire Agreement.

This Agreement and the documents to be executed pursuant hereto, together with the Sale Order, contain the entire agreement between the parties relating to the sale of the Purchased Assets.  Any oral representations concerning this Agreement or any such other document shall be of no force and effect.

d.    <u>Modification.</u>

This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the parties hereto.  Any material modifications must be approved by the Bankruptcy Court.

e.    <u>Closing Date.</u>

All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

f.    <u>Captions.</u>

All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

g.    <u>Further Assurances.</u>

Each party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other party hereto for the purpose of giving effect to the transactions contemplated herein or the intentions of the parties with respect thereto.

h.    <u>Waiver.</u>

No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

i.    <u>Payment of Fees and Expenses.</u>

Each party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transaction described herein.

j.    <u>Assignment</u>

This Agreement shall not be assigned by either party hereto without the prior written consent of the other party hereto; *provided*, that Buyer may assign its rights, interests and obligations hereunder (a) to any Affiliate of Buyer and (b) for the purpose of securing any financing of the transactions contemplated hereby; *provided*, *further*, that if Buyer makes any assignment referred to in (a) or (b) above, Buyer shall remain liable under this Agreement.

k.      <u>Binding Effect.</u>

Subject to the provisions of Section 9.j above, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the parties hereto.

l.      <u>Applicable Law.</u>

This Agreement shall be governed by and construed in accordance with the Laws of Commonwealth of Virginia without regard to conflicts of laws principles.

m.      <u>Good Faith.</u>

All parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

n.      <u>Construction.</u>

In the interpretation and construction of this Agreement, the parties acknowledge that the terms hereof reflect negotiations between the parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, to be drafted by either party hereto.

o.      <u>Counterparts.</u>

This Agreement may be signed in counterparts.  The parties further agree that this Agreement may be executed by the exchange of facsimile or other electronic signature pages provided that by doing so the parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

p.      <u>Time is of the Essence.</u>

Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

r.      <u>Post-Closing Matters.</u>

Following the Closing, Buyer and Seller each covenant to each other and agree to hold in trust and to promptly remit to the other any assets, including, but not limited to cash, that may come into (a) Buyer's or its Affiliates' possession that is not a Purchased Asset and (b) the Sellers' possession that constitutes a Purchased Asset.

s.      <u>Actions to Effect Closing.</u>

Each of the parties hereto shall use its reasonable best efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things necessary,

proper or advisable under applicable laws to consummate and make effective the transactions contemplated hereby.

t.    <u>Bankruptcy Court Jurisdiction.</u>

**EACH OF BUYER AND SELLERS AGREE THAT THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF VIRGINIA SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (a) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (b) THE PURCHASED ASSETS AND/OR ASSUMED LIABILITIES, AND BUYER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.**

**11.**    <u>**Definitions.**</u>

As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified.  For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to (i) vote 50% or more of the voting securities of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings.

"Agreement" has the meaning set forth in the Preamble.

"Ancillary Agreements" has the meaning ascribed thereto in Section 3.c.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Exceptions" has the meaning set forth in Section 5.c.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day on which banks in London, England and Richmond, Virginia are open for business.

"Buyer" has the meaning set forth in the Preamble.

"Books and Records" means all books, ledgers, files, reports, plans, records, manuals and other materials (in any form or medium) related to the Business.

"Closing" has the meaning set forth in Section 3.a.

"Closing Date" has the meaning set forth in Section 3.b.

"Closing Deadline" has the meaning set forth in Section 4.c.2.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Transaction" means any financing, refinancing, acquisition, divestiture, business combination or reorganization or similar transaction between the Sellers and any third party involving the Business, the Purchased Assets or the business, assets, Contracts, operations or equity securities of the Debtors.

"Consent" means any approval, authorization, clearance, consent, exemption, ratification or waiver of, declaration, filing or registration with or notice to any Person or the expiration or termination of any prescribed waiting period.

"Contracts" means all agreements, contracts, leases and subleases, purchase orders, arrangements, commitments and licenses (other than this Agreement and any instruments executed or delivered in connection herewith) that are Related to the Business as of the Closing, or to which any of the Purchased Assets are subject, whether written or oral, except to the extent included in the Excluded Assets.

"Debtors" has the meaning set forth in the Preamble.

"Enforceability Exceptions" has the meaning set forth in Section 5.a.

"Excluded Assets" has the meaning set forth in Section 1.b.

"Government Entity" means any federal, state or local court, administrative body or other governmental entity with competent jurisdiction.

"Governmental Authorizations" means all licenses, Permits, certificates and other authorizations and approvals related to the Business and issued by or obtained from a Government Entity.

"Hearing Date" has the meaning ascribed thereto in Section 8.c.

"Intellectual Property" means any or all of the following and all rights in, arising out of, or associated therewith, whether registered or unregistered, as applicable:  (i) United States and foreign patents and applications therefor and like protections throughout the world, including without limitation, the right to claim priority and the right to any continuation, division, or substitute application thereof and the right to any reissue, restoration, extension or reexamination of any patent thereof, improvements, amendments, renewals, and reissues of the same; (ii) inventions and discoveries (whether or not patentable and whether disclosed or undisclosed), invention disclosures, trade secrets, proprietary information, know-how, technical data, confidential business information (including but not limited to ideas, the results of research and

development, compositions, designs, drawings, specifications, customer and supplier lists, pricing and cost information and business and market studies, plans and proposals), and all documentation relating to and/or reflective of any of the foregoing; (iii) copyrights, mask works, copyright applications, copyright registrations and like protections throughout the world, works of authorship and derivative works thereof, whether published or unpublished and whether or not the same also constitutes a trade secret, websites and website content, written materials in any form, marketing and sales materials, and brochures; (iv) industrial designs and any registrations and applications therefor throughout the world; (v) trade names, trade dress and trade styles, product configurations, logos, common law trademarks and service marks, and trademark and service mark applications and registrations therefor in the United States and foreign countries and like protections, amendments, renewals and extensions of the same and all goodwill of the business associated with the foregoing throughout the world; (vi) databases, data structures and data collections and all rights therein throughout the world; (vii) all Web addresses, sites, domain names, domain name registrations and renewals, URLs, and IP addresses; (viii) computer software, object code, source code, interfaces, scripts, software documentation (including but not limited to all programmer-level, administrator and end user documentation and manuals); (ix) any similar corresponding or equivalent rights to any of the foregoing; (x) any and all rights under any license or other contract pertaining to any of the foregoing, regardless of ownership; and (xi) all documentation related to and/or reflective of any of the foregoing.

"Knowledge of the Seller" or a phrase of similar meaning shall be deemed to mean the knowledge of the Trustees.

"Landlord" means Canvasback Real Estate & Investments, LLC.

"Landlord Lease" means the lease agreement with the Landlord.

"Landlord Closing Obligations" has the meaning set forth in section 8.c.

"Law" means any law, statute, ordinance, rule, regulation, code, order, judgment, writ, injunction or decree enacted, issued, promulgated, enforced, or entered by a Government Entity.

"Liabilities" means any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including whether arising out of any contract or tort based on negligence or strict liability).

"Lien" means any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"Material Adverse Effect" means any change or changes, effect or effects, event or events, or circumstance or circumstances, that, individually or in the aggregate, are materially

adverse to the Purchased Assets, the Business, the Sellers or the ability of the Sellers to perform their obligations under this Agreement, except for any change, effect, event, occurrence or state of facts relating to (a) the economy or the financial markets in general, (b) the industry in which then Debtors operate in general and not specifically relating to the Debtors, or (c) changes in applicable Laws or regulations after the date hereof.

"New Zealand Subsidiary" means ZyGEM Corporation Limited, a New Zealand company.[1]

"Person" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Government Entity or other entity or organization.

"Permits" means permits, concessions, grants, franchises, licenses and other authorizations and approvals required or issued by any Government Entity and primarily used or held for use in connection with the Business.

"Preliminary Closing Date" means the date on which the Preliminary Closing takes place.

"Purchased Assets" has the meaning set forth in Section 1.a.

"Purchase Price" means the consideration to be paid by Buyer to Sellers for the Purchased Assets set forth in Section 2.a.1.

"Related to the Business" means required for, or primarily used in connection with, the Business as conducted by Sellers prior to the Closing.

"Sale Motion" has the meaning set forth in Section 8.c.

"Sale Order" has the meaning set forth in Section 8.c.

"Seller" has the meaning set forth in the Preamble.

"Seller Indemnified Parties" has the meaning set forth in Section 8.

"Shares" means the shares of the New Zealand Subsidiary owned by the ZyGEM Debtor.

"Stock Transfer Agreement" means an agreement in form and substance reasonably acceptable to Buyer and Sellers transferring the shares in ZyGEM Corporation Limited from the Debtors to the Buyer or its designee.

"Straddle Period" has the meaning set forth in Section 3.e.2.

---

[1] There has been mention that ZyGEM Management Ltd. will also be acquired.  To be confirmed.

"Straddle Period Taxes" has the meaning set forth in Section 3.e.2.

"Tax" means all taxes, charges, fees, duties, levies, penalties, or other assessments imposed by any federal, state, local or foreign governmental authority, including income, gross receipts, excise, property, sales, gain, use, license, custom duty, unemployment, capital stock, transfer, franchise, payroll, withholding, social security, minimum estimated, profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp, and other taxes, any amounts attributable to any failure to comply with any requirement regarding Tax Returns and any transferee or secondary liability in respect of taxes, including, in any case, any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any such document prepared on a consolidated, combined or unitary basis and also including any schedule or attachment thereto, and including any amendment thereof.

"Transaction Taxes" has the meaning set forth in Section 3.e.1.

[*Signature page follows*]

IN WITNESS WHEREOF, Buyer and Sellers have executed this Agreement as of the day and year first above written.

William S. Schneider, Chapter 7 Trustee for the
Bankruptcy Estate of ZyGEM Corporation


By: _William F. Schneider_
      Name:
      Title:


Andrew S. Goldstein, Chapter 7 Trustee for the
Bankruptcy Estate of MicroLab Diagnostics, Inc.


By: _____
      Name:
      Title:


ZGML ACQUISITION, INC.

By: _____
      Name:
      Title:

28

IN WITNESS WHEREOF, Buyer and Sellers have executed this Agreement as of the day and year first above written.

William S. Schneider, Chapter 7 Trustee for the
Bankruptcy Estate of ZyGEM Corporation


By: _____
     Name:
     Title:


Andrew S. Goldstein, Chapter 7 Trustee for the
Bankruptcy Estate of MicroLab Diagnostics, Inc.


By: _____
     Name: Andrew S. Goldstein
     Title: Chapt. 7 trustee for MicroLab Diagnostics, Inc.


ZGML ACQUISITION, INC.

By: _____
     Name:
     Title:

IN WITNESS WHEREOF, Buyer and Sellers have executed this Agreement as of the day and year first above written.

William S. Schneider, Chapter 7 Trustee for the Bankruptcy Estate of ZyGEM Corporation

By: _____

    Name:

    Title:

Andrew S. Goldstein, Chapter 7 Trustee for the Bankruptcy Estate of MicroLab Diagnostics, Inc.

By: _____

    Name:

    Title:

ZGML Acquisition, Inc.

By: _____

    Name: R.A. HEALEY

    Title: CHAIRMAN.

28

**SCHEDULE 1.a.:  Purchased Assets**

***ZyGEM CORPORATION ASSETS***

***Intellectual Property Rights***

1)  *All right, title, and interest in and to Intellectual Property owned by the ZyGEM Debtor including but not limited to those patent rights set forth in Attachment A hereto,  all rights of ZyGEM Debtor in the trade name "ZyGEM," all registered and common law trademark rights to the following: ZYGEM (U.S. Reg. No. 3639580).*

2)  *See Attachment A hereto.*

***Other Assets***

3)  *All Available Books and Records*

4)  *100% of Shares in New Zealand Subsidiary*

***MicroLab Diagnostics, Inc. Assets***

***Equipment***

5)  *DNA Analyzer Prototypes (full and partial)*

6)  *Broadboards*

7)  *Test Benches*

8)  *All Equipment and Tools in Lab at 705 D Dale Avenue, Charlottesville, Virginia not owned by Lockheed Martin Corporation.*

***Intellectual Property Rights***

9)  *All right, title, and interest in and to Intellectual Property owned by the MicroLab Debtor, including but not limited to those patent rights set forth in Attachment B hereto,*

XXIX

*and all registered and common law trademark rights of the Microlab Debtor in the trade name and trademark "MICROLAB DIAGNOSTICS."*

**10)** *See Attachment B hereto.*

---

### ***Other Assets***

---

**11)** *Design Documents*

**12)** *All Available Books and Records*

**13)** *Any and all assets identified in that certain Technology Assignment Agreement dated May 19, 2010 between MicroLab Diagnostics, Inc. and John Pettit, Ph.D. and Pettit Applied Technologies, Inc.*

## **ATTACHMENT A:  ZyGEM Patent Rights**

| TERRITORY | PATENT / PUB NUMBER |
|---|---|
| United States | 61/644,256 |
| United States | 61/672,122 |

## ATTACHMENT B:  MicroLab Patent Rights

| TERRITORY | PATENT / PUB NUMBER |
| --- | --- |
| United States | 5556790 |
| United States | 5955030 |
| United States | 6210973 |
| Canada PCT) | 2764707 (WO2010141140A1) |

# ATTACHMENT C

SCHEDULE A
LMC Tangible Assets

| TAG | MANUFACTURER | MODEL | PART NUMBER | DESCRIPTION | SERIAL | PURCHASE ORDER | ACQ COST |
|---|---|---|---|---|---|---|---|
| DNAMICRO002 | SAMSUNG | HX-D | N82E16822152178 | NG STORY Station 1TB External Hard Drive HX-DU010EB | - | 24710 | $ 99.99 |
| DNAMICRO003 | SAMSUNG | HX-D | N82E16822152178 | NG STORY Station 1TB External Hard Drive HX-DU010EB | - | 24710 | $ 99.99 |
| DNAMICRO004 | DELL | 1520 | N82E16834200027 | 70[2.20GHz] 15.4" Wide XGA 3GB Memory DDR2 800 25 | 5VR65M1 | 24710 | $ 549.00 |
| DNAMICRO005 | DELL | 1520 | N82E16834200027 | 70[2.20GHz] 15.4" Wide XGA 3GB Memory DDR2 800 25 | | 24710 | $ 549.00 |
| DNAMICRO006 | BRANSON | | 15-337-22H | Branson Ultrasonic Cleaners > 2.9A, 335w | | 24711 | $ 1,049.57 |
| DNAMICRO007 | THERMOSCIENTIFIC | | 400211OQ | ThermoScientific Labquake Tube Shaker/Rotator - Clip Ba | | 24711 | $ 416.08 |
| DNAMICRO008 | CERAMICO | 1100C | | Ceramco Inc. Furnacebox 1100C 35?G Temp | | 24711 | $ 3,255.00 |
| DNAMICRO010 | FISHER-SCIENTIFIC | DIRECT Q3 | 2RQSOP0VW | Direct-Q 3 Water Purification System | | 24712 | $ 3,685.00 |
| DNAMICRO011 | COLE-PARMER | | EW-11342-02 | Acculab ATILON Series Analytical Balances | | 24717 | $ 1,990.00 |
| DNAMICRO013 | COLE-PARMER | | EW-17309-30 | Variable-Speed Microcentrifuge | | 24717 | $ 1,700.00 |
| DNAMICRO016 | APPLIED BIOSYSTEMS | | 4314679 | Aluminum 96-Well GeneAmp PCR System | | DR024719 | $ 7,530.00 |
| DNAMICRO018 | Nikon Instruments Inc. | Ti-E | MEAS3100 | Ti-E Inverted Microscope | | 24777 | $ 55,623.00 |
| DNAMICRO020 | LABSMITH | SPS01 | SPS01 40UL | LabSmith SPS01 Programmable Syringe Pump | | 24782 | $ 750.00 |
| DNAMICRO021 | Applied Biosystems | ABI310 | 310-00-100 | ...ied Biosystems, ABI310 Capillary Electrophoresis Instrum | EJ864613 | ORDERED THRU MICROLAB | $ 65,000.00 |
| GR86BL | Test Equity | | GPR-1810D | ...PR 1810HD Power Supply 0-18 Volts, 0-10 Amps, Digital | | P-CARD | $ 342.00 |
| GR86M | LANCE CO | | OM-2A | CNC | 1080416 | TS7 | $ 61,520.00 |
| GR86BN | Dell | | 546142313 | Dell Inspiron 1564 | 6T574N1 | DR025121 | $ 606.99 |
| GR86BI | DELL | | 550894146 | Studio XPS 9100 | 88DDNM1 | PMD 13376 DR025174 | $ 1,399.00 |
| GR86P | AIR COMPRESSOR DIRECT | | PK5020VP | ...x 20-Gallon (Belt Drive) Dual Voltage Cast Iron Air Compr | 210062379 | P-CARD | $ 499.99 |
| DNAMICRO079 | CARVER | | GC4161392772 | AUTOPRESS | | T72 BBM650QK0 | $ 28,497.00 |
| GR86BQ | MCMASTER | | 8776A84 | Drill Press | 80341A | ANTONIO | $ 354.90 |
| GR86K | NEWEGG | | N82E16828118208 | MFP/J MFC / All-in-One Up to 30 ppm Up to 2400 FineP | CXF352698 | ANTONIO | $ 1,569.00 |
| GR86R | LOWES | | 91036 | Bench Belt/Disc Sander | 17578 | ANTONIO | $ 179.00 |
| GR86S | MCMASTER | | 2054189 | ...perated Heat Sealer with Timer Single Element, 20" X 1/ | 045196 | ANTONIO | $ 298.74 |
| GR86V | DISCOUNT LAPTOP SHOP | DELL LATITUDE E6400 | DELL LATITUDE E6400 | DELL LATITUDE E6400 CORE 2 DUO LAPTOP | DVV16X1 | ANTONIO | $ 850.00 |
| GR86W | GRAINGER | MDC-1 5FB | 6180-20 | ...lwaukee 6180-20 15 Amp 14-inch Abrasive Cutoff Mach | | 4100270178 | $ 188.99 |
| GR86X | MCMASTER | | 2097A12 | ...ectronic Micrometer 293-832, 0-1" (0-25mm) Range, Fric | 293-832 | 4100259917 | $ 107.95 |
| GR86D | MCMASTER | | 9365X62 | ...al Air Flowmeter 4 - 200 Ccm, 1/8" Compression Tube Fi | E20285/001 | 4100690046 | $ 1,169.23 |
| GR86C | EDMUND OPTICS | | NT39-711 | 10X/30X EO Inspection Stereo Microscope | 710265 | 4100690050 | $ 349.00 |
| GR86T | DISCOUNT LAPTOP SHOP | DELL LATITUDE E6400 | DELL LATITUDE E6400 | DELL LATITUDE E6400 CORE 2 DUO LAPTOP | J358631 | ANTONIO | $ 850.00 |
| GR86CG | LMCO TEAM | | 318B900-1 | Rapid DNA Analysis Platform - "BETA 2" | C01-2FV-002-001 | BUILD | $ 178,000.00 |
| GR86CH | LMCO TEAM | | 318B900-1 | Rapid DNA Analysis Platform - "TEST BENCH" | C01-2FV-001-001 | BUILD | $ 178,000.00 |

1

SCHEDULE A
LMC Tangible Assets

| | | | | | |
|---|---|---|---|---|---|
| GR8GCJ | LMCO TEAM | 318R900-1 | Rapid DNA Analysis Platform - "LOY1" | C01-ZYV-003-001 | BUILD | $ 178,000.00 |
| GR8GCK | LMCO TEAM | 318R900-1 | Rapid DNA Analysis Platform - "LOY2" | C01-ZYV-003-002 | BUILD | $ 178,000.00 |
| GR8GCL | LMCO TEAM | 318R900-1 | Rapid DNA Analysis Platform - "100" | C01-ZYV-A01-001 | BUILD | $ 178,000.00 |
| CHESAPEAKE | LMCO TEAM | 318R900-1 | Rapid DNA Analysis Platform - "103" | C01-LMC-A01-003 | BUILD | $ 178,000.00 |
| GR8GCM | LMCO TEAM | 318R900-1 | Rapid DNA Analysis Platform - "104" | C01-LMC-A02-001 | BUILD | $ 178,000.00 |
| GR8GCN | LMCO TEAM | 318R900-1 | Rapid DNA Analysis Platform - "105" | C01-LMC-A02-002 | BUILD | $ 178,000.00 |

2

# <u>ATTACHMENT D</u>

SCHEDULE B

## DNA Analyzer Patent Portfolio

**I.    U.S. Patent Applications:**

| APPLN. NO. | FILING DATE (PRIORITY DATE) | TITLE | ASSIGNEE | STATUS | ZYGEM EXHIBIT LIST |
|---|---|---|---|---|---|
| 13/064,091 (RV-00085; 410779US) | March 4, 2011 (June 4, 2009) | Optical Approach for Microfluidic DNA Electrophoresis Detection | Lockheed Martin Corporation ZyGEM Corp. Ltd. UVAPF | NTFMP (Decl): 6/25/12: Election; 9/18/12: FOA; 12/18/12: Amend; **Waiting** | Exhibits A, B, & C: Main Table Main Pivot Table Pivot Table Critical Critical |
| 13/064,093 (RV-00084; 410433US) | March 4, 2011 (June 4, 2009) | Multiple-Sample Microfluidic Chip for DNA Analysis | Lockheed Martin Corporation ZyGEM Corp. Ltd. | NTFMP (Decl); **Waiting** | Exhibits A, B, & C: Main Table Main Pivot Table Pivot Table Critical Critical |
| 13/064,094 (RV-00082; 410482US) | March 4, 2011 (June 4, 2009) | DNA Analyzer | Lockheed Martin Corporation ZyGEM Corp. Ltd. UVAPF | NTFMP (Decl): 2/6/12: Election; 4/2/12 FOA; 7/7/12 Amend; 11/15/12 Final; 3/15/12: RCE w/Amend; **Waiting** | Exhibits A, B, & C: Main Table Main Pivot Table Pivot Table Critical Critical |
| 13/273,947 (RV-00090; 410421US) | October 14, 2011 (October 15, 2010) | Micro Fluidic Optic Design | Lockheed Martin Corporation Also to be assigned: ZyGEM Corp. Ltd. | **Waiting FOA** | N/A |
| 13/773,350 (RV-00110; | February 21, 2013 (February 22, | Microfluidic Cartridge | To be assigned: Lockheed Martin | **Waiting FOA** | N/A |

1

SCHEDULE B

| | | | | Waiting FOA | |
|---|---|---|---|---|---|
| 41952US) | 2012) | Non-Contact Infrared Thermocycling | Corporation ZyGEM Corp. Ltd. | | N/A |
| 14/096,273 (RV-00111; 41418US) | December 4, 2013 | | To be assigned: Lockheed Martin Corporation ZyGEM Corp. Ltd. | | N/A |

II.   **Provisional Applications:**

| APPLN. NO. | FILING DATE | TITLE | STATUS | ZYGEM EXHIBIT LIST |
|---|---|---|---|---|
| 61/213,404 (RV-00082; 141788) | June 4, 2009 | Multiple Sample, Integrated Microfluidic Chip for DNA Analysis | NON-PROVISIONAL FILED | N/A |
| 61/213,405 (RV-00084; 141787) | June 4, 2009 | Fast Sample to Answer DNA Analyzer (Analytical Microdevice) | NON-PROVISIONAL FILED | N/A |
| 61/213,406 (RV-00085; 141786) | June 4, 2009 | Optical Approach for Microfluidic DNA Electrophoresis Detection | NON-PROVISIONAL FILED | N/A |
| 61/601,937 (RV-00110; 410422US) | February 22, 2012 | Microfluidic Cartridge | NON-PROVISIONAL FILED | Exhibits A, B, & C: Main Table, Main Pivot Table, Pivot Table Critical, Critical |
| 61/805,729 (RV-00122; 414527US) | March 27, 2013 | Microfluidic Cartridge Interface Module | Pending | N/A |

2

SCHEDULE B

III.   **PCT Applications:**

| Appln. No. | Filing Date (Priority Date) | Title | Assignee | ZyGEM Exhibit List |
|---|---|---|---|---|
| PCT/US2010/025904 (RV-00084; 410433WO) *Entered Nat'l. Stage* | March 2, 2010 (June 4, 2009) | Multiple-Sample Microfluidic Chip for DNA Analysis | Lockheed Martin Corporation ZyGEM Corp. Ltd. | Exhibits A, B, & C: Dead Critical |
| PCT/US2010/026801 (RV-00085; 410742WO) *Entered Nat'l. Stage* | March 10, 2010 (June 4, 2009) | Optical Approach for Microfluidic DNA Electrophoresis Detection | Lockheed Martin Corporation ZyGEM Corp. Ltd. UVAPF | Exhibits A, B, & C: Dead Critical |
| PCT/US2010/026791 (RV-00082; 410482WO) *Entered Nat'l. Stage* | March 10, 2010 (June 4, 2009) | DNA Analyzer | Lockheed Martin Corporation ZyGEM Corp. Ltd. UVAPF | Exhibits A, B, & C: Dead Critical |
| PCT/US2011/056357 (RV-00090; 410421WO) *Entered Nat'l. Stage* | October 14, 2011 (October 15, 2010) | Micro Fluidic Optic Design | Lockheed Martin Corporation Also to be assigned: ZyGEM Corp. Ltd. | N/A |
| PCT/US2013/027341 (RV-00110; 411952WO) | February 22, 2013 (February 22, 2012) | Microfluidic Cartridge | To be assigned: Lockheed Martin Corporation ZyGEM Corp. Ltd. | N/A |

3

SCHEDULE B

IV.    **Foreign Applications:**

A.    **Australia**

| APPLN. NO. | FILING DATE (PRIORITY DATE) | TITLE | ASSIGNEE | ZYGEM EXHIBIT LIST |
|---|---|---|---|---|
| 2010-257118 (RV-00084; 410433AU) | March 2, 2010 (June 4, 2009) | Multiple-Sample Microfluidic Chip for DNA Analysis | Lockheed Martin Corporation ZyGEM Corp. Ltd. | Exhibits A, B, & C: Main Table Main Pivot Table Critical |
| 2010-257127 (RV-00085; 410742AU) | March 10, 2010 (June 4, 2009) | Optical Approach for Microfluidic DNA Electrophoresis Detection | Lockheed Martin Corporation ZyGEM Corp. Ltd. UVAPF | Exhibits A, B, & C: Main Table Main Pivot Table Critical |
| 2010-257126 (RV-00082; 410482AU) | March 10, 2010 (June 4, 2009) | Multiple-Sample Microfluidic Chip for DNA Analysis | Lockheed Martin Corporation ZyGEM Corp. Ltd. UVAPF | Exhibits A, B, & C: Main Table Main Pivot Table Critical |
| 2011-315951 (RV-00090; 410421AU) | October 14, 2011 (October 15, 2010) | Micro Fluidic Optic Design | Lockheed Martin Corporation Also to be assigned: ZyGEM Corp. Ltd. | N/A |

4

SCHEDULE B

B.    Canada

| APPLN. NO. | FILING DATE (PRIORITY DATE) | TITLE | ASSIGNEE | ZYGEM EXHIBIT LIST |
|---|---|---|---|---|
| 2,764,678 (RV-00084; 41l433CA) | March 2, 2010 (June 4, 2009) | Multiple-Sample Microfluidic Chip for DNA Analysis | Lockheed Martin Corporation ZyGEM Corp. Ltd. | Exhibits A, B, & C: Main Table Main Pivot Table Critical |
| 2,764,707 (RV-00085; 410742CA) | March 10, 2010 (June 4, 2009) | Optical Approach for Microfluidic DNA Electrophoresis Detection | Lockheed Martin Corporation ZyGEM Corp. Ltd UVAPF | Exhibits A, B, & C: Main Table Main Pivot Table Critical |
| 2,764,704 (RV-00082; 410482CA) | March 10, 2010 (June 4, 2009) | DNA Analyzer | Lockheed Martin Corporation ZyGEM Corp. Ltd UVAPF | Exhibits A, B, & C: Main Table Main Pivot Table Critical |
| Not Yet Assigned (RV-00090; 410421CA) | October 14, 2011 (October 15, 2010) | Micro Fluidic Optic Design | Lockheed Martin Corporation Also to be assigned: ZyGEM Corp. Ltd. | N/A |

5

SCHEDULE B

C.    France

| APPLN. NO. | FILING DATE (PRIORITY DATE) | TITLE | ASSIGNEE | ZYGEM EXHIBIT LIST |
|---|---|---|---|---|
| 10706884.3 (RV-00084; 410433EP) | March 2, 2010 (June 4, 2009) | Multiple-Sample Microfluidic Chip for DNA Analysis | Lockheed Martin Corporation ZyGEM Corp. Ltd. | Exhibits A, B, & C: Main Table Main Pivot Table Critical |
| 10708482.4 (RV-00085; 410742EP) | March 10, 2010 (June 4, 2009) | Optical Approach for Microfluidic DNA Electrophoresis Detection | Lockheed Martin Corporation ZyGEM Corp. Ltd. UVAPF | Exhibits A, B, & C: Main Table Main Pivot Table Critical |
| 10708680.3 (RV-00082; 410482EP) | March 10, 2010 (June 4, 2009) | DNA Analyzer | Lockheed Martin Corporation ZyGEM Corp. Ltd. UVAPF | Exhibits A, B, & C: Dead Critical |

6

SCHEDULE B

D.    Germany

| Appln. No. | Filing Date (Priority Date) | Title | Assignee | ZyGEM Exhibit List |
|---|---|---|---|---|
| 11 2010 002 222.4 (RV-00084; 410433DE) | March 2, 2010 (June 4, 2009) | Multiple-Sample Microfluidic Chip for DNA Analysis | Lockheed Martin Corporation ZyGEM Corp. Ltd. | Exhibits A, B, & C: Main Table Main Pivot Table Critical |
| 11 2010 002 241.0 (RV-00085; 410742DE) | March 10, 2010 (June 4, 2009) | Optical Approach for Microfluidic DNA Electrophoresis Detection | Lockheed Martin Corporation ZyGEM Corp. Ltd. UVAPF | Exhibits A, B, & C: Main Table Main Pivot Table Critical |
| 11 2010 002 246.1 (RV-00082; 410482DE) | March 10, 2010 (June 4, 2009) | DNA Analyzer | Lockheed Martin Corporation ZyGEM Corp. Ltd. UVAPF | Exhibits A, B, & C: Main Table Main Pivot Table Critical |

7

SCHEDULE B

### E.    Great Britain

| APPLN. NO. | FILING DATE (PRIORITY DATE) | TITLE | ASSIGNEE | ZYGEM EXHIBIT LIST |
|---|---|---|---|---|
| 1121512.6 (RV-00084; 410433GB) | March 2, 2010 (June 4, 2009) | Multiple-Sample Microfluidic Chip for DNA Analysis | Lockheed Martin Corporation ZyGEM Corp. Ltd. | Exhibits A, B, & C: Main Table Main Pivot Table Critical |
| 1121510.0 (RV-00085; 410742GB) | March 10, 2010 (June 4, 2009) | Optical Approach for Microfluidic DNA Electrophoresis Detection | Lockheed Martin Corporation ZyGEM Corp. Ltd. UVAPF | Exhibits A, B, & C: Main Table Main Pivot Table Critical |
| 1121511.8 (RV-00082; 410482GB) | March 10, 2010 (June 4, 2009) | Multiple-Sample Microfluidic Chip for DNA Analysis | Lockheed Martin Corporation ZyGEM Corp. Ltd. UVAPF | Exhibits A, B, & C: Main Table Main Pivot Table Critical |

### F.    Gulf Cooperation Council

| APPLN. NO. | FILING DATE (PRIORITY DATE) | TITLE | ASSIGNEE | ZYGEM EXHIBIT LIST |
|---|---|---|---|---|
| 2011/19527 (RV-00090; 410421GC) | October 14, 2011 (October 15, 2010) | Micro Fluidic Optic Design | Lockheed Martin Corporation Also to be assigned: ZyGEM Corp. Ltd. | N/A |

SCHEDULE B

## G.   Mexico

| APPLN. NO. | FILING DATE (PRIORITY DATE) | TITLE | ASSIGNEE | ZYGEM EXHIBIT LIST |
|---|---|---|---|---|
| Not Yet Assigned (RV-00090; 41042IMX) | October 14, 2011 (October 15, 2010) | Micro Fluidic Optic Design | Lockheed Martin Corporation Also to be assigned: ZyGEM Corp. Ltd. | N/A |

## H.   United Kingdom

| APPLN. NO. | FILING DATE (PRIORITY DATE) | TITLE | ASSIGNEE | ZYGEM EXHIBIT LIST |
|---|---|---|---|---|
| Not Yet Assigned (RV-00090; 41042IGB) | October 14, 2011 (October 15, 2010) | Micro Fluidic Optic Design | Lockheed Martin Corporation Also to be assigned: ZyGEM Corp. Ltd. | N/A |

## <u>SCHEDULE 1.b:  Excluded Assets</u>

*1)  Accounts receivable of the Debtors.*

*2)  Any and all Equipment and Tools owned by Lockheed Martin Corporation identified on Attachment C hereto.*

*3)  Lockheed Martin Corporation's interest in the patent rights identified on Attachment D hereto.*

*4)  Any and all software developed by Lockheed Martin Corporation and to which Lockheed Martin has established or claimed ownership or title.*

## SCHEDULE 2.a.2:  Purchase Price Allocation

MicroLab Debtor        -        50% of total purchase price

ZyGEM Debtor           -        50% of total purchase price[2]

---

[2] This allocation assumes the occurrence of the Closing pursuant to the terms of this Agreement.  If only the Preliminary Closing occurs, the Preliminary Purchase Price shall constitute property of the ZyGEM Debtor's estate.

## **SCHEDULE 2.b:  Assumed Liabilities**

*1. Pre-petition and post-petition, general unsecured and administrative claims of Northwestern University against the Debtors.*

## SCHEDULE 5.k:  Affiliate Business Operations

*The ZyGEM Debtor's wholly owned subsidiary, ZyGEM Corporation Limited, owns certain intellectual property rights and reagents that are used in the Business.*